**HEFFLINGER, Appellant,**

v.

**WHITACRE TRUCKING, INC. et al., Appellees.**

Court of Common Pleas of Ohio,
Wood County.

No. 93CV407.

Decided June 22, 1994.

*Betty F. Coggin,* for appellant Glenn E. Hefflinger.

*Paul S. Goldberg,* for appellee Whitacre Trucking, Inc.

*Lee Fisher,* Attorney General, and *Virginia M. Wall,* Assistant Attorney General, for appellee Ohio Bureau of Employment Services.

CHARLES F. KURFESS, Judge.

This matter comes before the court on an appeal from the Unemployment Compensation Board of Review filed January 20, 1994, and memoranda in support and opposition thereto.

The facts of this matter arise out of the discharge of appellant Glenn E. Hefflinger from his employment with appellee Whitacre Trucking, Inc. as a truck driver on October 16, 1992. Appellee discharged appellant upon appellee's insurance carrier's notification that appellant was no longer insurable due to an accumulation of traffic violation points on his record. Specifically, appellant had "seven activities and five points within three (3) years on his motor vehicle record (MVR) from the Ohio Bureau of Motor Vehicles."

Following his discharge, appellant applied for unemployment compensation benefits, which were denied on the basis that he was discharged by his employer "for just cause in connection with the work." Appellant then appealed to the Administrator of the Ohio Bureau of Employment Services, who reconsidered the denial and found that his discharge was "under nondisqualifying conditions" and allowed his claim. Appellee then appealed that decision to the Unemployment Compensation Board of Review, where a hearing was held, following which a referee's report was issued that found that appellant's discharge was for "just cause" in connection with his work and therefore disallowed his claim for unemployment compensation benefits. Appellant then filed an application to institute a further appeal before the board of review, which was denied. Subsequently, appellant appealed to this court.

Appellant's appeal to this court is made pursuant to R.C. 4141.28(O), which requires a court to determine if the board decision was unlawful, unreasonable, or against the manifest weight of the evidence. R.C. 4141.28(O); *Angelkovski v. Buckeye Potato Chips Co.* (1983), 11 Ohio App.3d 159, 161, 11 OBR 242, 243–244, 463 N.E.2d 1280, 1282–1283. In making that determination, the court is limited to legal issues and is specifically excluded from making *de novo* determinations of factual matters. *Brown–Brockmeyer Co. v. Roach* (1947), 148 Ohio St. 511, 36 O.O. 167, 76 N.E.2d 79; *Kilgore v. Unemp. Comp. Bd. of Review* (1965), 2 Ohio App.2d 69, 31 O.O.2d 108, 206 N.E.2d 423; *Angelkovski v. Buckeye Potato Chips Co., supra.*

The linchpin legal issue in this appeal centers around the determination of "just cause" and whether appellant's discharge was for "just cause."

The statutorily created term "just cause" is used to detail those situations wherein a discharged employee may not collect unemployment benefits. Specifically, R.C. 4141.29(D)(2)(a) provides that no one may collect unemployment

benefits if it is found that the employee "quit his work without just cause or has been discharged for just cause in connection with his work * * *." Just cause has been determined by the Supreme Court to be " 'that which, to an ordinarily intelligent person, is a justifiable reason for doing or not doing a particular act.' " *Irvine v. Unemp. Comp Bd. of Review* (1985), 19 Ohio St.3d 15, 17, 19 OBR 12, 14–15, 482 N.E.2d 587, 589–590 (quoting *Peyton v. Sun T.V* [1975], 44 Ohio App.2d 10, 12, 73 O.O.2d 8, 9, 335 N.E.2d 751, 752). In the context of that definition, the reviewing court, in assessing the appealed matter, must consider the particular facts and determine within those parameters whether the termination was for just cause.

In this regard, the court must consider the fairness of any policy pursuant to which the company discharged the employee. The factors which determine fairness can be divided into a four-part calculus: (1) whether the employee received notice of the policy; (2) whether the policy could be understood by the average person; (3) whether there is a rational basis for the policy; and (4) whether the policy instituted by the employer was applied to some individuals but not to others. *Shaffer v. Am. Sickle Cell Anemia Assn.* (1986), Cuyahoga App. No. 50127, unreported, 1986 WL 6711.

While a truck driver employee being uninsurable may be a rational basis for his termination, fairness in appellant's discharge also hinges on how appellee determined the insurability of appellant.

Through testimony it has been established that no employee would be hired without first obtaining the approval of the insurance carrier. Further, the discharge of employees has de facto been placed in the hands of the insurance carrier and its determination of the insurability of an employee.[1] Therefore any

---

1. In relevant part, Linda Whitacre stated the following in regard to the insurance company's imputed hiring and firing of employees:

" * * * when we are interested in a driver, we call with an MVR [Motor Vehicle Report], with their [the employee's] driver's license, their social security number, they [the insurance carrier] run it through and they say yeah or nay, being whether we can hire the driver or not hire the driver. And they have the guidelines. [Transcript I, February 18, 1993, at 10.]
" * * *
"Q. Okay, so, sometime prior to these renewal—to this insurance renewal every year, every one of your driver's records is reviewed, is that correct?
"A. That's right.
"Q. And, if the insurance company says the driver goes, automatically they go, is that correct?
"A. We have no choice.
"Q. So, then, invariably if the insurance company has said this driver goes, that—the driver is out the door?
"A. If they say—if they write us a letter and say that we must terminate, then yes, we do terminate. [Transcript I, at 13.]
" * * *

review of this matter must be a determination of the fairness of the insurance company's policy on insuring drivers.

[redacted] If fairness were to be viewed from the employer's point of view, there is no question that the discharge of appellant would be fair and would meet that standard because a truck driving company cannot be expected to maintain the employment of one who cannot be insured. But the determination of just cause, as used in R.C. 4141.29, refers to a justifiable reason for terminating an employee "*from the employee's perspective and necessarily must be predicated upon conduct of the employee.*" (Emphasis added.) *Morris v. Ohio Bur. of Emp. Serv.* (1993), 90 Ohio App.3d 295, 299, 629 N.E.2d 35, 37.

[redacted] Following the four-part calculus set out in the *Shaffer* decision, there is no question from the facts that the appellant/employee had notice of the policy that he was to be discharged if he was no longer insurable.[2] Further, a reasonable person could understand that if the insurance company failed to insure an employee that employee would no longer be employed. What does pose a problem in this analysis, though, is the ability of employees to understand how the insurability determination was implemented.

The testimony of both Linda Whitacre and Dan Whitacre, president and corporate treasurer, respectively, of appellee, clearly establishes that personnel decisions relating to the hiring and retention of employees were a function of appellee that was delegated to the insurance carrier. (See footnote 1.) The company having delegated this important function of the company, it was up to the company to ensure that employees understood the procedure the insurance company undertook in assessing driver MVRs. Without a clear understanding of the insurance company's assessment procedures, employees had no way of knowing what kind of or exactly how many infractions, or "activities," would endanger their insurability, and ultimately their jobs.

---

"Our insurance company periodically runs MVR reports on my drivers. They review our drivers—any serious violations on their record, they take a look at. If somebody has too many violations on their record, *they force me to terminate them.*" (Transcript II, March 26, 1993, at 6; emphasis added.)

On the same subject, Dan Whitacre, in relevant part, stated the following:

"It's [retention of employees] out of my control, it's in the hands of the insurance company. They tell me who they will insure. [Transcript II, at 9.]

"* * *

"I can't rehire him [Glenn Hefflinger] without insurance approval. [Transcript II, at 18.]

"* * *

"The insurance company tells me who I can hire and who I have to fire." (Transcript II, at 21–22.)

2. In testimony before the hearing officer, Hefflinger answered affirmatively to the question, "You were aware that you had to be insurable to the company in order to continue working for them [appellee], is that right?" (Transcript III, at 8.)

[redacted]

Testimony in this matter established not only that appellant did not fully understand the insurance company's review policy [3] but that the appellee/employer had abdicated its control over personnel hiring and retention to the point that it was not fully aware of the insurance carrier's policy on insurability.[4] In fact, the testimony indicated that both Mr. and Mrs. Whitacre, in their duties on

3. In relevant part, Hefflinger answered as follows:
"Q. Is it correct that you were informed that you should not have any more than four offenses?
"A. Well, that's kind of a shady area—I don't really recall being told by the management. They had a safety meeting that Mr. Grow [insurance company representative] * * * conducted and at that meeting, * * * I think that question was brought up; and his reply at that time was five minors over a period of three years [would endanger one's insurability]."

4. On this matter, Mrs. Whitacre testified as follows:
"Q. Now if I'm reading the Motor Vehicle Report correctly, he [appellant] had five points on his record from August of '90 through July of '92. Is that how you're reading it?
"A. There are five points, yes, but there are six activities—seven activities—and they don't just go by points, they go by activity.
"Q. And by activity you mean?
"A. Each violation is considered as one activity. Whether they are convicted or not, it's still considered an activity on their license. [Transcript I, at 9.]
" * * *
"Q. So you don't know then what the guidelines are by which the insurance company told you that you needed to terminate somebody that you had represented to be a capable and quality employee?
"A. We know that three offenses are what they're using now. [Transcript I, at 10.]
" * * *
"Q. * * * was the insurance company policy to tell you you had to terminate that employee if they had more than four offenses of any kind on their record?
"A. Yes.
"Q. So, you had in October of '92, then you had no drivers for Whitacre Trucking who were, who had more than four offenses on their record, is that correct?
"A. That could not be explained, yes. [Transcript I, at 11.]
" * * *
"Q. All right, now, let's—you were talking about offenses a few minutes ago. You were saying that invariably, that somebody with four—with more than four offenses on his record, was terminated from employment with your company before October of '92, is that correct?
"A. If the insurance company said so, yes.
"Q. Okay. Now, if the insurance company said so, *did the insurance company say so in every case?*
"A. *No.*
"Q. What would the circumstances be when the insurance company would not say 'terminate someone with more than four violations'?
"A. I don't know that that ever specifically came up. * * * [Transcript I, at 12; emphasis added.]
" * * *
"Q. And then refer—does it make decisions to which ones to refer to the insurance company?
"A. I—as far—I have no idea what they send to the insurance company. As far as I'm aware, they send them all to the insurance company.
"Q. But you're not sure of that, you don't know how their decision is made?
"A. No." (Transcript I, at 15.)

behalf of appellee, relied exclusively upon the recommendation of the insurance company in regard to employees. (See footnote 1.) The bottom line then is that if the employer does not understand the policy, then it certainly could not explain the policy in understandable terms to employees.

Of particular consternation to the court was the testimony from Mrs. Whitacre regarding the insurance carrier's review policy and the understandability of that policy. Mrs. Whitacre testified that at one time there were written guidelines that had been provided by appellee's insurance carrier, but when appellant was discharged no such guidelines existed. In fact, at the time of appellant's firing the only policy was to wait for the annual review by the insurer and act upon its recommendation.[5] It appears that appellant had been advised and understood that his retention as an employee was dependent upon the determination by appellee's insurer as to appellant's continued insurability. But appellant was not advised with clarity, relative precision, or in an understandable fashion the method by which he might be determined to be uninsured.

Appellant also contends that the policy as to insurability of employees was not applied equally to all employees. At the hearing of this matter, appellant called two other truck driver employees, Robert Lemay and Thomas Kiehne, Jr., who testified as to their driving records as maintained by the Bureau of Motor Vehicles. In testimony, Kiehne indicated that in August 1992 he had five violations on his MVR and that as of the date of the hearing he had six violations; in spite of these violations he had not been fired, in fact had not even been told that he was uninsurable or risking uninsurability. (Transcript III, April 22, 1993, at 19–20.) Further, Lemay indicated in his testimony that his MVR contained four citations for speeding, a wrong-traffic-lane violation, and an accident in October 1990; but yet Lemay was still employed by appellee Whitacre Trucking and there had been no indication that he had been refused insurance coverage by the insurance carrier or would soon be refused such coverage. (Transcript III, at 23–24.)

---

5. Mrs. Whitacre testified as follows in regard to the insurance carrier's stated policy:
"Q. Okay. So you would say that the record then is not—I'm sorry, the guidelines are not specific, that it's whenever the insurance company decides?
"A. There are specific guidelines. And they have them, I'm sure, because the company—not the company—not New Hampshire, and not Heritage, but before that, three or four years ago we were with a company called Oxidental [phonetics] and we had written guidelines.
"Q. You had written guidelines when you were with Oxidental?
"A. Yes, uh-huh.
"Q. Okay, now, may I ask the reason that you no longer have written guidelines?
"A. Because we run everything through the insurance company and they tell us yeah or nay. And if they tell us no, then we just don't pursue it." (Transcript I, at 14.)
In further testimony, Mrs. Whitacre gave even more insight into the employment policy appellee used when she stated that "if we have received a letter that says terminate, we have—had no choice but to terminate."

While upon initial review of these records it may appear that they too were in violation of standards of the insurance carrier and should have been determined to be uninsurable, the conclusion is unavoidable that their records and appellee's disregard of them lends additional ambiguity and lack of clarity and understanding to the policy used by the insurer and appellee in determining the insurability of employee drivers.

The court therefore concludes that the policy upon which appellee terminated the employment of appellant was not one which could be readily understood by the average person. Further, there is a serious question whether the policy was applied in a fair manner. Therefore, the policy in question does not meet the standard of fairness.

■ A policy of firing and hiring employees based upon their insurability, although proper, must inform the employees in a clear, understandable manner of the methods used by the employer in making that determination to sustain a just-cause termination on the basis of that policy. The responsibility of the employer in his regard is not diminished by relying upon the insurance carrier's method of making such determinations.

The court therefore finds that the decision of the Unemployment Compensation Board of Review, denying appellant's claim, is against the manifest weight of the evidence and is reversed and vacated.

IT IS THEREFORE ORDERED that appellant's appeal and claim for unemployment compensation be granted and he be permitted to participate in unemployment compensation benefits.

Costs of this matter to be assessed against appellee Whitacre Trucking.

*Judgment accordingly.*